FILED

02/26/2019

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 3, 2018

IN RE JULIAN J. ET AL.

Appeal from the Juvenile Court for Dickson County
No. 05-17-052-CC   Michael Meise, Judge

_____

No. M2018-00882-COA-R3-PT

_____

A mother and father appeal the termination of their parental rights to two children.  The juvenile court found four statutory grounds for termination of mother's parental rights and two statutory grounds for termination of father's parental rights.  The court also found that termination of both parents' parental rights is in the children's best interest.  We conclude that the record contains clear and convincing evidence to support one ground for termination against Mother and two grounds for termination against Father.  We further conclude that termination of parental rights is in the children's best interest.  So we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed as Modified**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which THOMAS R. FRIERSON II and ARNOLD B. GOLDIN, JJ., joined.

Steven Hooper, Waverly, Tennessee, for the appellant, Ricky J.

Jennifer L. Honeycutt, Nashville, Tennessee, for the appellant, Cecilia B.

Herbert H. Slatery III, Attorney General and Reporter, and Erin A. Shackelford, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I.

#### A.

Cecilia B. ("Mother") and Ricky J. ("Father") had two children, Julian, born in July 2007, and Caydence, born in May 2009. On February 15, 2016, the Tennessee Department of Children's Services ("DCS") received a referral alleging that Father had exposed the children to drugs. The subsequent investigation revealed that Father tested positive for bupronephrine. Father had a prescription for the drug, but the pill count was short by three pills. So DCS referred Father to drug education services, which he chose not to pursue.

Two days later, DCS received a second referral for drug exposure, this one concerning Mother. Mother tested positive for methamphetamines and benzodiazepines. DCS began services for the family but did not remove the children from Mother's custody. At a subsequent children and family team meeting on March 31, 2016, Mother failed another drug screen, again for methamphetamines.

On April 4, 2016, a third party reported to DCS that she had been assaulted by Mother and her boyfriend in the presence of the children. At this point, Mother and the children were living in a hotel with the boyfriend. The caller also claimed that needles were present in the hotel room with the children. Law enforcement found both methamphetamine and marijuana in the room. Mother was arrested for drug possession and domestic assault. Meanwhile, Father was in jail for drug possession.

That same day, DCS filed an emergency petition in the Juvenile Court for Dickson County, Tennessee, to adjudicate the children dependent and neglected and grant temporary legal and physical custody of the children to DCS. According to the petition, in addition to concerns about drug abuse, DCS discovered that the children had an extensive truancy record. The juvenile court granted temporary legal and physical custody of the children to DCS.

On April 25, 2016, DCS, with the participation of the parents, created a permanency plan, with the goals of returning the children to Mother or placing them with relatives. For both parents, the plan concentrated on remedying their problems with substance abuse and their pending criminal charges. The plan anticipated both parents would submit to random drug screens, resolve their criminal charges, avoid new criminal charges, and follow all probation requirements. In addition, the plan required Mother to complete an inpatient substance abuse program and follow recommendations and

2

continue outpatient therapy for her mental health issues. And the plan required Father to complete an alcohol and drug assessment and follow any recommendations.

The plan granted the parents four hours per month of therapeutic visitation with the children. The parents were required to follow all parenting recommendations made by the supervisor and demonstrate their ability to parent the children appropriately. The parents were also expected to obtain and maintain both housing and employment and provide verification. Finally, the parents were each required to pay $100 per month in child support.

At the preliminary hearing on June 22, 2016, the court ratified the permanency plan and added two new requirements. And the court ordered both parents to submit to an alcohol and drug assessment before the next court date and to pass a drug screen before each visit with the children.

Both Mother and Father completed the required alcohol and drug assessment. Mother's assessment recommended that she complete a 12-step program. And Father was advised to complete a two-week relapse prevention course. Neither parent complied with the recommendations. Mother failed multiple drug screens throughout the summer and fall of 2016. And she was arrested for possession again in August. Father was incarcerated throughout much of July, August, and September, and after his release, he failed two drug screens in November.

Neither parent appeared for the adjudicatory hearing. Father was in jail; Mother claimed to lack transportation. So the hearing proceeded as to Mother only. On November 9, 2016, the court adjudicated the children dependent and neglected due to drug exposure.

On January 17, 2017, DCS revised the permanency plan.[1] Based on the parents' lack of progress, the revised plan changed the goal from returning the children to adoption. Both parents were on probation, and they had not addressed their substance abuse issues. Mother had also failed to continue her outpatient therapy.

The revised plan also eliminated some requirements while adding others. The revised plan no longer required stable housing or employment. And instead of an inpatient substance abuse program, the revised plan required Mother to submit to random drug screens, complete a 12-step program, continue her outpatient therapy, comply with her probation, and avoid incurring new criminal charges. Similarly, the revised plan required Father to submit to random drug screens, resolve his pending criminal charges, comply with his probation, avoid new charges, and complete a two-week relapse

---

[1] At trial, the family service worker testified that the permanency plan was also revised in October 2016. But the October plan is not in the record on appeal.

prevention course. The requirements to pay child support and demonstrate appropriate parenting remained the same.

At a review hearing on February 22, 2017, the court learned that the parents had not demonstrated appropriate parenting during visitations. So the court suspended visitation until both parents completed a parenting assessment.

The parents had no contact with the children for the next six months. Mother eventually completed a parenting assessment and an online parenting course, allowing her to resume visits on September 27, 2017. Father also completed his assessment and parenting classes. But due to repeated incarcerations, Father did not have another visit until December 15, 2017.

On May 1, 2017, DCS filed a petition to terminate the parental rights of both parents. DCS asserted four statutory grounds for termination against Mother: abandonment by failure to provide a suitable home, abandonment by incarcerated parent, substantial noncompliance with the permanency plan, and persistence of conditions. DCS asserted two statutory grounds for termination against Father: abandonment by incarcerated parent and substantial noncompliance with the permanency plan.

B.

The termination hearing proceeded without the parents in attendance. Although each of their attorneys requested a continuance, the court denied the requests; both Mother and Father had failed to appear at the previous setting of the case the month before. And the case had been continued previously at Mother's and Father's request.

DCS offered several witnesses in support of the petition. The family service worker ("FSW") explained that neither parent adequately addressed their substance abuse issues. Mother only attended orientation for her 12-step program. And Father did nothing at all. According to the FSW, both parents continued throughout the case to test positive for illegal substances. And as recently as the day before trial, Mother admitted to the FSW that she knew she had a substance abuse problem; she just was not ready to address it.

According to the FSW, the parents' conduct made it difficult, if not impossible, for her to provide necessary services. The parents did not remain in contact with DCS. They often failed to return phone calls or provide a current address. Father's frequent incarcerations also impeded the FSW's ability to provide services. The Dickson County jail would not allow her to arrange for services while Father was in jail.

Inability to maintain contact with the parents also interfered with visitation. From the outset, the care coordinator had difficulty contacting either parent to schedule visits.

4

And even after visits were scheduled, the parents were often late, or they would call to cancel or change location at the last minute. The inconsistency hurt the children. Over the two years the children had been in foster care, Mother only visited fifteen times and Father, nine.

Despite two years of therapeutic visitation, Mother's and Father's parenting skills never improved. During visits, the children were often defiant and disrespectful. The care coordinator attributed the children's behavior to a lack of parenting skills. Although she clearly loved her children, Mother failed to set boundaries or redirect the children when they became unruly. And she made the children false promises. Father had similar issues with setting boundaries, and he also demonstrated insensitivity to the children's feelings, especially Julian's. His focus was more on himself than the children.

Disruptive behavior often followed contact with the parents. After the parents' phone calls, the children had difficulty listening and following directions. They also became aggressive with each other and their foster siblings.

Both children entered foster care with academic, dental, and emotional issues. But while in foster care, many of their issues were remedied. Caydence had made huge strides academically and was thriving in her current environment. Julian was also more successful at school and had discovered a talent for sports. The children had received dental work, and Julian had been taught how to brush his teeth.

Yet not all of the children's issues could be easily remedied. Shortly after entering foster care, Julian revealed to his in-home therapist that Father had physically abused him. Caydence had witnessed the abuse. And in the fall of 2016, Julian was hospitalized for psychotic symptoms. He was diagnosed with depression and psychosis. With medication and therapy, his psychotic episodes greatly decreased. But he continued to struggle to process his feelings about Father.

His therapist explained that, emotionally, Julian was much younger than his chronological age. About a year before trial, Julian no longer wanted to see Father. And the foster mother explained that his behavior regressed significantly after contact with Father. He became aggressive and angry and sometimes had psychotic episodes. The therapist opined that contact with Father was not beneficial for Julian and that Father and son did not have a healthy relationship.

On the other hand, the therapist agreed that both children love Mother. And she loves them. In the therapist's opinion, if Mother could make the necessary adjustments in her life, the children would benefit from a continued relationship with her. But, with their lengthy stay in foster care, the children had grown increasingly frustrated over both parents' lack of progress.

5

The foster mom described the close relationship that had developed between her family and the children over the past two years. She expressed a desire to adopt the children should that become a possibility.

The juvenile court found that DCS had proven all alleged grounds for termination by clear and convincing evidence. The court further found clear and convincing evidence that termination of parental rights was in the children's best interest. As a consequence, the court terminated both Mother's and Father's parental rights.

**II.**

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Statute identifies those circumstances in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights. *See* Tenn. Code Ann. § 36-1-113(g) (2017).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). Second, if one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is

otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A. GROUNDS FOR TERMINATION

1. Persistence of Conditions

DCS concedes on appeal that one ground for termination of Mother's parental rights relied on by the court, persistence of conditions, was not applicable. After reviewing the record, we agree.

At the time the petition was filed, the ground of persistence of conditions applied when the "child has been removed from the home of the parent . . . by order of a court for a period of six (6) months." Tenn. Code Ann. § 36-1-113(g)(3). The six-month period has generally been measured from the order adjudicating the child dependent and neglected. *See In re Audrey S.*, 182 S.W.3d 838, 875-76 (Tenn. Ct. App. 2005). In this case, although the adjudicatory hearing on the petition for dependency and neglect was held on September 29, 2016, the juvenile court did not enter an order on the hearing until November 9, 2016, less than six months before the petition was filed. So the statutory ground of persistence of conditions could not apply.

2. Abandonment

Another statutory ground for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). Statute recognizes "five alternative definitions for abandonment as a ground for the termination of parental rights." *In re Audrey S.*, 182 S.W.3d at 863; *see also* Tenn. Code Ann. § 36-1-102(1)(A) (2017) (defining the term "abandonment"). The juvenile court concluded that Mother abandoned the children under the second definition, abandonment by failure to provide a suitable home, and that both parents abandoned the children under the fourth definition, abandonment by an incarcerated parent. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii), (iv).

a. Failure to Establish a Suitable Home

A child has been abandoned under the second statutory definition if the child has been removed from the home of a parent as a result of a petition filed in juvenile court, which ultimately results in a finding that the child was dependent and neglected, and

7

for a period of four (4) months following the removal, the department . . . has made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but . . . the parent . . . ha[s] made no reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that [the parent] will be able to provide a suitable home for the child at an early date.

*Id.* § 36-1-102(1)(A)(ii). DCS's efforts to assist the parent "may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal." *Id.*

In evaluating reasonable efforts, we are concerned with the time period from April 5, 2016, the day following the children's removal, to August 5, 2016. DCS had the burden of proving that its efforts were reasonable under the circumstances. *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014).

On appeal, DCS concedes that its proof of reasonable efforts was insufficient. We agree. At trial, the FSW was unaware of any efforts by DCS to assist Mother with housing during the relevant four-month period.

b. Abandonment by an Incarcerated Parent

The fourth definition of "abandonment" applies in cases in which the parent is incarcerated or had been incarcerated within the four-month period preceding the filing of the petition to terminate. Tenn. Code Ann. § 36-1-102(1)(A)(iv). On appeal, DCS concedes that this ground for termination was inapplicable to Mother. We agree. Although DCS submitted evidence at trial of Mother's criminal history, including a list of charges, the record lacks proof that Mother was incarcerated during the relevant time period.

Because Father was incarcerated when the termination petition was filed, however, we must consider whether this record contains clear and convincing evidence that this ground for termination has been proven as to Father. Abandonment by an incarcerated parent "contains two distinct tests." *In re Audrey S.*, 182 S.W.3d at 865. One test examines pre-incarceration visitation and support, and the other examines the pre-incarceration conduct of the parent. The incarcerated or formerly incarcerated parent is deemed to have abandoned a child if he or she:

either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's . . . incarceration, or the parent . . . has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

8

Tenn. Code Ann. § 36-1-102(1)(A)(iv).

### i. Willful Failure to Support

The juvenile court found that Father had willfully failed to support or make reasonable payments toward the support of the children during the four-month period. While it was undisputed that Father never paid any child support, proof that Father's failure to support was willful is lacking. The question of willfulness "is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013). A parent's failure to support a child is not willful if the parent is financially unable to do so. *In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at *6 (Tenn. Ct. App. Aug. 4, 2014). In making a willfulness determination, the court must review a parent's means, which includes both income and available resources for purposes of support. *See In re Adoption of Angela E.*, 402 S.W.3d at 641.

This record contains no evidence of Father's income, expenses, or available resources during the relevant time period. We cannot conclude that the evidence is clear and convincing that the failure to support was willful because DCS failed to establish that Father had the ability to pay support.

### ii. Wanton Disregard for the Welfare of the Children

The juvenile court also found that Father had abandoned the children by exhibiting wanton disregard for the welfare of his children. "Wanton disregard" is not a defined term. "[A]ctions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68. "[T]he parent's incarceration [is] a triggering mechanism that allows the court to take a closer look . . . to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child. *Id.* at 866.

We conclude that DCS has proven by clear and convincing evidence that Father's pre-incarceration conduct exhibited a wanton disregard for the welfare of his children. DCS submitted an extensive list of criminal charges against Father. Although many of the charges were dismissed, Father was found guilty of escape from custody, violating the financial responsibility law, and driving on a suspended or revoked license. *See*

Tenn. Code Ann. §§ 39-16-605 (2018) (escape), 55-12-139 (2012) (violation of the financial responsibility law), 55-50-504 (2012) (driving on a suspended or revoked license). And he was indicted by a grand jury for theft of a cell phone. There was also a report of physical abuse perpetrated by Father against one of the children. Father's repeated incarcerations coupled with the evidence of physical abuse and his unresolved substance abuse issues leave no serious doubt that Father was either unfit to parent or posed a risk of substantial harm to the children's welfare.

3. Substantial Noncompliance with the Permanency Plans

The juvenile court also found clear and convincing evidence that both parents were in substantial noncompliance with the requirements of the permanency plans. Before analyzing whether a parent complied with the permanency plan, the court must find that the permanency plan requirements that the parent allegedly failed to satisfy are "reasonable and are related to remedying the conditions that necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C) (2014); *see also In re Valentine*, 79 S.W.3d at 547. If the permanency plan requirements are reasonable, the court must then determine if the parent's noncompliance was substantial. *Id.* at 548-49. The unsatisfied requirements must be important in the plan's scheme. *Id.* A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004).

We conclude that the permanency plan requirements here were reasonable and related to the conditions that necessitated foster care. The children entered foster care after drugs were found in their home and both their parents were incarcerated. The most recent permanency plan required Mother and Father to submit to alcohol and drug assessments and follow the recommendations, submit to random drug screens, resolve their criminal charges, comply with probation requirements, and avoid incurring new charges. All of these requirements were designed to remedy the parents' substance abuse and legal issues. Mother was also required to continue her outpatient therapy. And both parents were expected to pay child support, demonstrate appropriate parenting, and follow the recommendations from the provider of therapeutic visitation.

Next, we must determine whether each parent's noncompliance is substantial in light of the importance of the requirements to the overall plan. *See In re Valentine*, 79 S.W.3d at 548-49. Our focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). "[A] permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives." *In re V.L.J.*, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014). "[P]arents must complete their

responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis." *Id.*

We conclude that DCS proved by clear and convincing evidence that Mother and Father were in substantial noncompliance with the requirements of the permanency plan. One of the main concerns throughout this case was the parents' substance abuse. They made very little effort to address this problem. Although they both completed an alcohol and drug assessment, neither parent followed the recommendations. Mother was told to complete a 12-step program. She only went to orientation. And as recently as the day before trial, she admitted that she was not ready to face her issues. Father failed to even start a relapse prevention course. Even after their assessments, the parents continued to test positive for illegal substances.

Both parents also failed to complete other permanency plan requirements. Mother did not continue her outpatient therapy. And Father repeatedly violated his probation requirements. Neither parent made any progress in demonstrating appropriate parenting despite two years of instruction. And they never paid any child support.

## B. BEST INTEREST OF THE CHILD

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). So even if a statutory ground for termination is established by clear and convincing evidence, we must also determine whether termination of parental rights is in the child's best interests. Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts may consider in making a best interest analysis. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682.

The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. Additionally, the analysis should take into account "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016).

11

After considering all the statutory factors, the juvenile court determined that termination of parental rights was in the children's best interest. The court emphasized the parents' lack of adjustment in circumstances over a two-year period, their inconsistent visitation, and the children's strong bond with the foster family. Mother challenges the court's finding that she failed to make changes in her life. She also contends that the juvenile court gave insufficient weight to her strong bond with her children.

The first two statutory factors look at the parent's current lifestyle and living conditions. The first factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the [parent's] home." Tenn. Code Ann. § 36-1-113(i)(1). The evidence simply does not support Mother's claim that she made significant changes in her life. Mother and Father failed to follow the recommendations from their alcohol and drug assessments. They continued to test positive for illegal drugs. They were arrested repeatedly. They also made no appreciable progress in improving their parenting skills. The evidence does not preponderate against the court's finding that this factor favored termination.

The second factor considers the potential for lasting change. *See id.* § 36-1-113(i)(2) (asking "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible."). In two years, neither parent made an appreciable change. And DCS's efforts to assist them were reasonable under the circumstances. This factor also favors termination.

Under the third factor, we consider whether the parents visited the children regularly. *See id.* § 36-1-113(i)(3). The evidence does not preponderate against the court's finding that the parents' visitation was inconsistent. In two years, Mother visited fifteen times and Father nine.

The fourth factor considers "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-1-113(i)(4). The court did not specifically mention this factor in its decision. And we agree that the evidence supports a finding that Mother and the children enjoy a meaningful relationship. So this factor militates against terminating Mother's parental rights. But with regard to Father, the evidence was clear that Father did not enjoy a meaningful relationship with the children. Julian wanted nothing to do with him, and Caydence was ambivalent.

The fifth factor evaluates the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). DCS's witnesses described the impact of a change in caregivers as detrimental or challenging. The evidence does not preponderate against the court's finding that this factor favors termination. The children have bonded with their foster family. And during their time

12

with the foster family, both children have made significant strides. But Mother and Father's parenting skills have never improved. Removing the children from their current environment risks a return to their previous difficulties. This is especially true for Julian who suffers from depression and psychosis and continues to struggle with the aftermath of abuse.

Under the sixth factor, the court determines whether the parent or another person residing with the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child" or another person in the home. *Id.* § 36-1-113(i)(6). The court also did not address this factor. But Julian reported past physical abuse by Father. And the care coordinator described some verbal abuse during visitation. This factor favors termination of Father's parental rights.

The seventh factor focuses on the parent's home environment and ability to be a safe and stable caregiver. *See id.* § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [the intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner."). This record is replete with evidence that neither parent is currently able to be a safe and stable caregiver. The parents' failure to address their substance abuse issues renders them unable to consistently care for the children in a safe and stable manner.

The eighth statutory factor evaluates the parent's mental and emotional health, asking "[w]hether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child." *Id.* § 36-1-113(i)(8). The record contains very little evidence concerning either parent's mental health. Although Mother was receiving outpatient therapy at the outset of the case, DCS offered no proof as to how Mother's mental health impacted her ability to parent.

The ninth factor looks at the parent's child support history. *See id.* § 36-1-113(i)(9). Neither parent paid any child support while the children were in foster care. This factor favors termination.

We conclude that DCS proved, by clear and convincing evidence, that termination of parental rights was in the children's best interest. Although the court may have given insufficient weight to Mother's relationship with her children, the combined weight of the proven facts amount to clear and convincing evidence that termination of both Mother's and Father's parental rights is in the children's best interests.

13

## III.

The record contains clear and convincing evidence to support terminating the parental rights of Mother and Father on the ground of substantial noncompliance with the permanency plan. We also find clear and convincing evidence that Father abandoned his children by exhibiting wanton disregard for their welfare. The record does not support the other statutory grounds for termination relied on by the juvenile court. The record also contains clear and convincing evidence that termination is in the children's best interest. Thus, we affirm the judgment terminating parental rights as modified.

_____
W. NEAL MCBRAYER, JUDGE